## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ELLIS LEATON,

        Plaintiff,

v.                                           No. 09 CV 382 JCH/CG

NAVAJO REFINERY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant Navajo Refining Company, LLC's Amended Motion to Dismiss and/or Stay Proceedings* [Doc. 14] and its *Motion for Summary Judgment* [Doc. 18]. After considering the motions, briefs, exhibits, and the law, and being otherwise fully informed, the Court finds that Defendant's motions are not well-taken and should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This Court is the third forum in which Plaintiff has brought claims arising from the termination of his employment with Defendant Navajo Refining Company, LLC ("Navajo Refining"). Plaintiff filed claims pursuant a Collective Bargaining Agreement, which were heard by an arbitrator, statutory claims in New Mexico state district court, and the instant claims in this Court. As such, the procedural history is somewhat complicated.

Plaintiff worked for from August 1998 through November 2007. Navajo Refining operates an integrated oil refinery in Artesia, New Mexico, which produces a full range of petroleum products and distributes them through pipelines and trucks throughout the southwest.[1]

---

[1] This background section is supplemented by the background set out by the arbitrator when rendering his ruling. *See* Arbitration Opinion and Award, attached as Ex. D to Defendant's Motion for Summary Judgment [Doc. 18] at 2-4. This background section is meant

During his nine years of employment with Navajo Refining, Plaintiff progressed from an entry level position to manning one of the refinery's control boards as a "B Operator."  Progression to the B Operator level occurs subsequent to experience at the C, D, and E levels, and employees who make this progression undergo training and must pass examinations.  Plaintiff was diagnosed with diabetes in 2001.  *See* Complaint at 2, ¶ 10.  The diabetes affected Plaintiff's "ability to work, sleep and walk."  *Id.*  Defendant was aware of Plaintiff's medical condition.  *See id.* at ¶ 11. In 2003 and 2004, during his time as a C Operator, Plaintiff was counseled for several incidents involving over-pressuring and flaring.  In response to these incidents, Defendant offered Plaintiff counseling and medical evaluation and, in 2005, Plaintiff took three months of paid medical leave for treatment of his diabetes.  After returning from leave, Plaintiff began training for a promotion to B Operator, which he completed in August 2005.  However, because of an incident involving the improper opening of a valve, which constituted a safety violation, he was placed on probation for six months.

Eventually, in November 2006, Plaintiff was promoted to B Operator.  Soon thereafter, on December 28, 2006, Plaintiff received a written reprimand for sleeping on the job.  Plaintiff "provided medical documentation to support that his medical condition and medicine was a contributing factor, and that he was required to work a sixteen hour shift on that day."  *Id.* at 3, ¶ 15.  Then, on February 28, 2007, Plaintiff received a ten-day suspension for sleeping on the job and other performance issues involving carelessness, unsatisfactory work quality, and rudeness to other employees.  As a result of these issues, Plaintiff received a last and final warning.  Plaintiff contends that he was treated differently than similarly situated employees, because other

_____

to provide context for Plaintiff's claims and the Court's ruling; the Court did not consider any extra-record facts in arriving at its decision.

workers slept while they were supposed to be working but were not disciplined.  *See id.* at ¶ 16-17.  Plaintiff also contends that he requested accommodation for his medical condition, specifically "that during long shifts hours, he be given the opportunity to walk around for a specified period of time, to allow circulation to his legs, and prevent him from falling asleep," but that Defendant denied his request.  *Id.* at 3-4, ¶ 18.  However, on May 22, 2007, as a result of mediation of his grievance over that disciplinary action, Defendant agreed to remove the disciplinary action from his record as long as he did not violate any other work rules in the next two years.  In June and July 2007, Plaintiff took paid leave to undergo stomach bypass surgery, which he felt would improve his health and work performance, including making sleeping on the job less likely.

Plaintiff returned to work as a B Operator in August 2007.  On October 8, 2007, while Plaintiff was operating the control board, a tower became overpressured and released a flare. Although alarms were sounding to indicate the unsafe condition, Plaintiff made no adjustments, and an A Operator had to take over the control board and reduce the pressure.  Soon thereafter, on October 20, 2007, another over-pressure incident occurred in which Plaintiff allegedly failed to respond with corrective action.  Then, on October 24, 2007, another flaring incident occurred. In this instance, alarms warning of over-pressure had sounded for more than thirty minutes before the flare occurred.  Plaintiff was on duty that day, and had relieved another B Operator during the approximate time period that the flaring incident occurred.  However, Plaintiff claims that he was not responsible for this incident, and those responsible were never disciplined.  *See id*. at 4, ¶ 19.  Ostensibly as a result of the three tower flares on October 8, 20, and 24, Plaintiff was placed on administrative leave on October 30, 2007, pending review of the incidents.  While on administrative leave, Plaintiff made a report of discrimination to Defendant's attorney.  *See*

3

*id.* at ¶ 20.  Plaintiff claims that, "immediately thereafter Defendant initiated a frivolous investigation against Plaintiff."  *Id*.

On November 20, 2007, while still on administrative leave pending investigation into Plaintiff's response to the three flaring incidents, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New Mexico Human Rights Bureau ("NMHRB"), based on his national origin (Hispanic), disability (diabetes), and religion (Jehovah Witness).  *See id*. at 4, ¶ 22.  Just ten days after he filed his charge of discrimination, on November 30, 2007, Plaintiff's employment was terminated.  *See id*. at 5, ¶ 23.  Navajo Refining and the International Union of Operating Engineers, Local # 351 (the "Union") had previously executed a Collective Bargaining Agreement ("CBA") covering the terms and conditions of employment for the bargaining unit members.  *See* Defendant's Motion [Doc. 18] at 3.  Plaintiff was a member of the bargaining unit.  *See id*.  On December 6, 2007, Plaintiff filed a termination grievance with the Union, which was denied on December 10, 2007.  Plaintiff appealed this denial, and requested binding arbitration, which was conducted through the Federal Mediation and Conciliation Service on September 11, 2009.

While Plaintiff's appeal was pending, he filed a suit in state court, again alleging discrimination based on national origin, disability, and religion.  His state court complaint stated claims for disability discrimination under the Americans with Disabilities Act and the New Mexico Human Rights Act ("NMHRA"), claims for religious discrimination under the NMHRA and Title VII, and national origin discrimination under the NMHRA and Title VII.  *See* State Court Complaint filed October 6, 2008, attached as Ex. E to Defendant's Motion for Summary Judgment.  Prior to filing his complaint in state court, on June 24, 2008, Plaintiff filed another charge with the EEOC and NMHRB, this time alleging retaliation for filing his earlier charge as

4

well as discrimination based on age.  On January 20, 2009, Plaintiff received a Dismissal and

Notice of Right to Sue from the EEOC based on this second charge.  *See* Ex. A attached to

Complaint.  On April 20, 2009, Plaintiff filed his underlying complaint in this action, claiming

retaliation and age discrimination.  Plaintiff states that his federal complaint "arises out of the

same underlying facts as his State Court suit; it just includes related yet different legal theories

for recovery (i.e. Age Discrimination and Unlawful Retaliation)."  Doc. 15 at 8.

On April 20, 2009, he did not serve

Defendant within the 120 day timeframe mandated by Fed. R. Civ. P. 4(m).  Therefore, on

September 28, 2009, the Court entered an Order to Show Cause why the case should not be

dismissed for lack of prosecution.  *See* Doc. 8.  On October 8, 2009, Plaintiff responded to the

Court's Order to Show Cause, explaining that the failure to serve Defendant was due to an office

error caused by confusion between the state case and the federal case, and noting that Defendant

had been provided a copy of the federal complaint (although not formally served) back on May

20, 2009.  *See* Doc. 9.  Plaintiff formally served Defendant with the complaint on October 9,

2009.  *See id.,* Ex. A.

On September 17, 2009, the state court stayed proceedings in its case pending the

arbitrator's decision.  *See* Ex. E attached to Doc. 12.  On December 2, 2009, the arbitrator issued

a decision denying Plaintiff's termination grievance.  Specifically, the arbitrator found: (1) no

evidence that Defendant's disciplinary action against Plaintiff was based on race, religion, or

disability, in part because Plaintiff admittedly presented no evidence of any such discrimination;

and (2) that Defendant's "use of progressive discipline in attempts to correct [Plaintiff's]

performance deficiencies provided just cause for his termination."  Arbitration Opinion and

Award, attached as Ex. D to Defendant's Motion for Summary Judgment [Doc. 18] at 14.  On

July 9, 2010, the state court granted summary judgment to Defendant, finding that the arbitrator's decision on the race, disability, and religion claims is binding on the parties in state court.

## LEGAL STANDARD

Summary Judgment is appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997); Fed. R. Civ. P. 56(c). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 484 (10th Cir. 1995).

In its memorandum in support of its motion, Defendant asserts that "[p]rior to bringing this action, Plaintiff brought claims arising from the same transactions upon which he relies in bringing this federal action in both arbitration proceeding and in state district court." Doc. 18 at 1. Defendant argues that because the arbitrator has issued a decision in its favor, Plaintiff is precluded under the theories of *res judicata* and/or collateral estoppel from bringing this cause of action. *See id.* at 3. In its reply, Defendant further asserts that the doctrines of *res judicata* and collateral estoppel apply because Plaintiff is bound by the Collective Bargaining Agreement to arbitrate his statutory claims. *See* Doc. 22 at 2. Therefore, Defendant seeks summary judgment based only on Plaintiff's ability to bring his claims in this Court, not on the merits of Plaintiff's claims. Although the Court is denying Defendant's motion for summary judgment on this basis, Defendant is not precluded from bringing a motion for summary judgment on the merits of Plaintiff's claims following discovery.

## ANALYSIS

6

A. <u>Failure to Timely Serve</u>

In its *Motion to Dismiss*, Defendant argues that Plaintiff's case should be dismissed because he failed to serve the complaint within the specified timeframe and cannot show good cause for his failure.[2]  Fed. R. Civ. P. 4(m) states that if a defendant is not served within 120 days of the filing of a complaint, a court may dismiss the action with prejudice or order that service be made within a particular time, but if the plaintiff shows good cause for the failure, the court must extend the time for service.

In the Tenth Circuit, when determining whether to extend time for service under Fed. R. Civ. P. 4(m), courts employ a two-step analysis.  *See Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir. 1995).  First, the court looks to see whether a plaintiff is entitled to a mandatory extension of time through a demonstration of good cause for failing to timely effect service.  *See id.*  If a plaintiff cannot show good cause, the court then considers whether a permissive extension of time is justified.  *See id.*  Good cause requires "some showing of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified." *Putnam v. Morris*, 833 F.2d 903, 905 (10th Cir. 1987).  Rule 4(m)'s good cause provision "should be read narrowly to protect only those plaintiffs who have been meticulous in their efforts to comply with the Rule." *Despain v. Salt Lake Area Metro Gang Unit*, 13 F.3d 1436, 1438 (10th Cir. 1994).  Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).  Simple "inadvertence or negligence alone do not constitute

---

[2] Defendant's Motion to Dismiss also raises the same issues of *res judicata* and collateral estoppel that are raised in its Motion for Summary Judgment.  Those issues will be addressed later in this opinion, in the context of ruling on the Motion for Summary Judgment.

'good cause' for failure of timely service.  Mistake of counsel or ignorance of the rules also usually do[es] not suffice."  *In re Kirkland*, 86 F.3d 172,176 (10th Cir. 1996).  Similarly, "although a small delay in achieving service may not prejudice the defendant, absence of prejudice alone does not constitute good cause."  *Despain*, 13 F.3d at 1439.  Ultimately, an attorney should "treat the 120 days with the respect reserved for a time bomb."  *Cox v. Sandia Corp.*, 941 F.2d 1124, 1126 (10th Cir. 1991).

In Plaintiff's response to the Order to Show Cause, Plaintiff's counsel explains that, when the deadline to serve the complaint came up in counsel's internal calendaring system, a staff member marked out the deadline under the mistaken impression that the case was already underway, although the only active case was actually the parallel one pending in state court.  *See* Doc. 9 at 2.  In his response to Defendant's motion to dismiss, Plaintiff argues that good cause exists for an extension of the 120 days to serve process because "an internal office error caused the deadline to be marked out."  Doc. 15 at 7.  The Court cannot agree that good cause exists for Plaintiff's failure to timely serve Defendant.  The phrasing "internal office error" makes the error sound like a computer glitch, when in reality, it was a human error that occurred several months after the Complaint had been filed.  Plaintiff offers no explanation why counsel waited until July to set a calendar deadline to serve a complaint that had been filed in April.  Inadvertence and inattention to the requirements of service under the Federal Rules of Civil Procedure is not good cause.  Further, an attorney is not entitled to shirk his duties by passing the responsibility to a staff member.  The attorney remains culpable for inadvertent acts of his staff.  There was no good cause for service not being timely made upon Defendant.  Because Plaintiff has not demonstrated good cause, the Court will not grant a mandatory extension of time for service.

In the face of a failure to show good cause, the Court may exercise its discretion and

either dismiss the case without prejudice or extend the time for service.  *See Espinoza*, 52 F.3d at 842.  Where, as in this case, the dismissal of the case would have the impact of a dismissal with prejudice,  such as when the statute of limitations would bar refiling of the claim in federal court, the Tenth Circuit recommends considering factors such as the following: "(1) the degree of actual prejudice to the other party; (2) the amount of interference with the judicial process; (3) the litigant's culpability; (4) whether the court warned the party in advance that dismissal would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1143 (10th Cir. 2007) (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992)).  Nevertheless, the fact that the statute of limitations has run does not by itself make dismissal inappropriate.  *See Despain*, 13 F.3d at 1439.

    Plaintiff asserts that these circumstances support a permissive extension by the Court because he served Defendant quickly after the show-cause order was entered and Plaintiff would be prejudiced by a dismissal because his time to re-file the lawsuit has passed.  Plaintiff also argues that Defendants would not be prejudiced by the delay.  The Court agrees that these circumstances call for a permissive extension.  Plaintiff's failure to serve appears to have been inadvertent rather than an attempt to gain a strategic advantage.  Dismissal in this instance would be with prejudice because Plaintiff's time to re-file has passed.  Defendant had notice of the complaint shortly after it was filed, and was intimately familiar with the factual basis for the claim, having conducted litigation and discovery on the same set of occurrences in state court. Plaintiff had not been warned in advance that dismissal was likely, and he quickly corrected his mistake upon notice by the Court.  Therefore, the Court will exercise its discretion to grant a permissive extension, and will deny Defendant's motion to dismiss for failure to timely serve.

B.  Claim Preclusion

Defendant first argues that Plaintiff's cause of action is barred by the doctrine of *res judicata*, otherwise known as claim preclusion.  Under the doctrine of  claim preclusion, "a final judgment on the merits of an action precludes the parties or those in privity with them from relitigating issues that were or *could have been* raised in the prior action."  *Wilkes v. Wyo. Dep't of Employment Div. of Labor Standards*, 314 F.3d 501, 503-04 (10th Cir. 2002) (emphasis in original).  Claim preclusion applies when three elements exist: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits."  *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (citing *Wilkes*, 314 F.3d at 504)."  In this case, the first element is met, as Defendant received a final judgment on the merits in the arbitration action.  Although the Union was technically the named party in the arbitration, as opposed to Plaintiff bringing the current action in his capacity as an individual, the Court will assume for purposes of this motion that Plaintiff and the Union are in privity, so that the second element is met as well.  Plaintiff chose to pursue his claims through the Union's grievance procedure, and he worked with the Union attorney in the presentation of his claims.  *See* Plaintiff's Deposition, attached as Ex. B to Def't. Mot. [Doc. 18] at 177:4-9; 179:23-180:20.  However, the third element is missing, because the cause of action is not the same in both suits.  Plaintiff's cause of action that was arbitrated involved his claim that Defendant violated the CBA by discriminating against him based on his national origin, disability, and religion.  His cause of action in this Court involves his claim that Defendant violated federal law by retaliating against him for filing an EEOC complaint and terminating him because of his age.

Defendant's argument presumes that Plaintiff was bound by the CBA to arbitrate his

statutory claims, and it is that obligation that prevents him from raising other claims in this

action.  However, the CBA did not obligate Plaintiff to bring his statutory claims as part of his

arbitrated termination grievance.   An agreement by an employee to arbitrate discrimination

claims does not prevent the employee from bringing a claim in federal court in defense of his

statutory rights where the collective bargaining agreement did not explicitly address arbitration

of statutory rights.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49 (1974).  The

Supreme Court recently clarified the circumstances under which a union member operating

under a CBA can be required to submit statutory claims of discrimination to binding arbitration

in *14 Penn Plaza, LLC v. Pyett*, 129 S. Ct. 1456 (2009).  *14 Penn Plaza* held that a union may

agree to the inclusion of a provision in a CBA that mandates arbitration of statutory claims as

well as contractual claims, and such an agreement will prevent an individual from pursuing

statutory claims in another forum, as long as the agreement is sufficiently clear.  129 S. Ct. at

1466-68.  The Court made clear that *14 Penn Plaza* involved the issue of the enforceability of an

agreement to arbitrate statutory claims, as opposed to "the quite different issue [of] whether

arbitration of contract-based claims precluded subsequent judicial resolution of statutory

claims," which was at issue in *Gardner-Denver.  Id*. at 1468 (quoting *Gilmer v.

Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991)).

The Court explicitly reaffirmed the holding of *Gardner-Denver*, which it characterized as

follows:

> Because the [CBA] gave the arbitrator authority to resolve only questions of
> contractual rights, his decision could not prevent the employee from bringing the
> Title VII claim in federal court regardless of whether certain contractual rights are
> similar to, or duplicative of, the substantive rights secured by Title VII....The
> employee had not waived his right to pursue his Title VII claim in federal court by
> participating in an arbitration that was premised on the same underlying facts as the
> Title VII claim.  Thus, whether the legal theory of preclusion advanced by the

11

employer rested on the doctrines of election of remedies or was recast as resting instead on the doctrine of equitable estoppel and on themes of res judicata and collateral estoppel, it could not prevail in light of the [CBA's] failure to address arbitration of Title VII claims.  [The *Gardner-Denver* Court held] that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a *contractual* claim is dispositive of a statutory claim under Title VII.

129 S. Ct. at 1467 (citations and internal quotation marks omitted) (emphasis in original).

The *14 Penn Plaza* Court limited its holding to CBAs that "clearly and unmistakably" required union members to arbitrate their statutory claims.  *Id.* at 1461.  The provision at issue in *14 Penn Plaza* prohibited discrimination on the basis of race, color, age, disability, sex, national origin, union membership, "or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the [ADA], the [ADEA],...or any other similar laws, rules, or regulations."  *Id.*  The same provision mandated that "[a]ll such claims shall be subject to the grievance and arbitration procedures...as the sole and exclusive remedy for violations."  *Id.*

In this case, the CBA did not "clearly and unmistakably" require arbitration of statutory claims.  In fact, statutory claims are not even mentioned in the CBA.  Article X of the CBA covers Non-Discrimination and prohibits discrimination against any employee "because of race creed, color, age, national origin, sex or handicap."  *See* CBA, attached as Ex. A to Def't Mot. [Doc. 18] at 25.  Article XV of the CBA prohibits discriminatory discharge, and states that "claims of discriminatory and of wrongful or unjust discipline or discharges shall be subject to settlement" as provided in the Grievance and Arbitration procedures of the CBA [Article XIII]. *Id* at 28.  Article XIII, setting out the grievance procedure, does not mention statutory discrimination claims either.  At no point in the CBA are statutory remedies, including Title VII or the ADEA, mentioned.  Thus, the Court cannot say that the Union "clearly and unmistakably"

agreed to arbitrate statutory claims, and Plaintiff is not prohibited from bringing those claims in this Court despite having arbitrated his contractual claims.

    B.  Issue Preclusion

    Defendant also claims that, even if Plaintiff was not bound to arbitrate his statutory claims, he cannot now challenge the arbitrator's factual findings under the doctrine of collateral estoppel, otherwise known as issue preclusion.  Issue preclusion, "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim."  *Park Lake Res., Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004).  Application of issue preclusion requires four elements: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  *See U.S. v. Rogers*, 960 F.2d 1501, 1507 (10th Cir. 1992).  An arbitration proceeding may have the same preclusive effect as any other judicial decision. *See Coffee v. Dean Witter Reynolds, Inc.*, 961 F.2d 922, 925 n.4 (10th Cir. 1992).

    Issue preclusion implicates only "issue[s] of ultimate fact."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1093 (10th Cir. 2003).  In issuing his opinion, the arbitrator found that: (1) Plaintiff presented no evidence that Defendant's disciplinary action against him was based on race, religion or disability; and (2) Defendant's use of progressive discipline in attempts to correct Plaintiff's performance deficiencies provided just cause for his termination.  *See* Arbitration Opinion and Award, attached as Ex. D to Defendant's Motion for Summary Judgment [Doc. 18] at 14.  The Court finds that these issues are not identical to the issues

13

presented in this underlying action, and therefore the decisions on these issues do not preclude Plaintiff from pursuing his claims.

As previously discussed, the arbitrator was interpreting only contractual provisions. Plaintiff's statutory claims are based on federal and state law. They were not decided by the arbitrator, nor could they have been decided by him. Quite simply, the arbitrator was not authorized to resolve any of Plaintiff's statutory claims. The CBA, by its own words, limits the topics considered by the arbitrator to the matters included within the CBA. Specifically, Article XIV of the CBA states that "Arbitrators are to base their decisions only on the above data and shall not attempt to interpret any matter outside of the Agreement." CBA at 28. Because the Court has held that statutory claims are outside of the CBA, the arbitrator is without authority to adjudicate them. Nor did the arbitrator's decision, which only covered discrimination on the basis of national origin, disability, and religion, address Plaintiff's current claims of retaliation and age discrimination. The arbitrator's finding that Defendant had just cause to terminate Plaintiff's employment is necessarily based on his interpretation of the CBA, and it does not automatically preclude a statutory claim.

In order to state a *prima facie* claim for retaliation, a plaintiff must demonstrate only: (1) that he engaged in a protected activity; (2) he suffered a material adverse action; and (3) a causal nexus exists between his activity and the employer's adverse action. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). In this case, Plaintiff engaged in the protected activity of filing an EEOC complaint and he was terminated ten days later.[3] At this stage of the

---

[3] Close temporal proximity may give rise to an inference of retaliation if the adverse action is very closely connected in time to the protected activity. *See Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).

proceedings, before discovery has been conducted, the Court cannot say categorically that a finding of just cause for termination under the CBA precludes a retaliation claim.  Although a plaintiff would certainly have an uphill battle to overcome the finding of just cause, he must still be allowed to present evidence that the employer's motivation in firing him was improper, as this is a separate question from just cause under the contract.

Under Tenth Circuit precedent, even if an employee violated the employer's rules, giving the employer just cause to terminate the employee under the contract, a statutory retaliation claim raises the question of whether the employer's motivation for termination was the rule violation or the protected activity engaged in by the employee.  *See Garley v. Sandia Corp.*, 236 F.3d 1200, 1213 (10th Cir. 2001); *Jarvis v. Nobel/Sysco Food Svcs. Co.*, 985 F.2d 1419, 1427 (10th Cir. 1993).  Although these other cases arose in the context of whether a statutory retaliation claim was preempted by federal law, the fundamental distinction that the cases drew between the analysis of a contractual just cause claim (which requires an interpretation of the CBA) and a retaliation claim (which does not) applies in this case as well.

Similarly, the Court cannot say, as a matter of law, that a finding of just cause for termination under the CBA automatically precludes a plaintiff from bringing a claim under the ADEA.  Although one of the elements of a *prima facie* case of unlawful termination under the ADEA is that a plaintiff was doing satisfactory work, *see Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004), whether a plaintiff was doing satisfactory work is not an identical question to whether the company had just cause to terminate him under the CBA. Certainly, the two issues overlap closely, but the Court cannot categorically say that, under all possible circumstances, a person could not be found by a trier of fact to have been doing satisfactory work at the same time that a company had the right to terminate them under the

15

contract.  For example, when an employer is necessarily downsizing, it may have just cause under a CBA to terminate employees who are doing satisfactory work.  In a summary judgment proceeding on the merits, Plaintiff may well fall short of being able to establish his *prima facie* case.  However, at this point in the proceedings, the Court must allow Plaintiff's claim to proceed.

## <u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that *Defendant Navajo Refining Company, LLC's Amended Motion to Dismiss and/or Stay Proceedings* [Doc. 14] and its *Motion for Summary Judgment* [Doc. 18] are DENIED.

_____
**UNITED STATES DISTRICT JUDGE**